Amy Honodel
Nevada Bar No. 7755
e-mail: amy@chlvlaw.com
CHASEY HONODEL
3295 N. Fort Apache Rd., Ste. 110
Las Vegas, NV 89129
(702) 233-0393
(702) 233-2107 (fax)

Lisa Counters
(Pro Hac Vice)
Arizona Bar No.  016436
lisa@countersfirm.com
The Counters Firm, P.C.
20987 N. John Wayne Parkway
Ste. B104-381
Maricopa, AZ  85139

Attorneys for Plaintiff
LAVON WILLIAMSON

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| LAVON WILLIAMSON, a married  person,<br><br>                              Plaintiff,<br><br>v.<br><br>Life Insurance Company of North America,<br>a foreign corporation,<br><br>                              Defendant. | **Case No.: 2:10-cv-00499-KJD-RJJ**<br>_____<br><br><br>**RESPONSE TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(6)** |

LINA's motion ignores the obvious:  for a claim to be governed by the Employee Retirement Income Security Act ("ERISA"), there must actually be an employee involved. Plaintiff Lavon Williamson ("Williamson") was not an employee of First Command Financial Planning, Inc. ("First Command") and his claim for long term disability benefits is not governed or preempted by ERISA.

1     Life Insurance of North America ("LINA") attempts to frame the issue as being one that

2    does not require this Court to determine whether Williamson was an "employee" for ERISA

3    purposes.  But his employment status must be determined and is a question of fact.  LINA asks

4    this Court to adopt new law relating to "beneficiary" standing under ERISA, but to do so would

5    go beyond the scope of F.R.C.P. 12(b)(6) and directly contradict Ninth Circuit precedent.

6    LINA's Motion to Dismiss (the "Motion") should be denied.

7 **I.     WILLIAMSON'S COMPLAINT MEETS THE REQUIREMENTS UNDER
         F.R.C.P. 12(B)(6).**

8

9     Williamson provides factual allegations in his Complaint that, if true, entitle him to relief.

10   *See* F.R.C.P. 12(b)(6); *see also Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984) ( "A court

11   may dismiss a complaint only if it is clear that no relief could be granted under any set of facts

12   that could be proved consistent with the allegations.") (citations omitted).  LINA alleges that

13   Williamson "has asserted only a mere conclusion that the Policy is not governed by ERISA," and

14   that this conclusion is "not supported by factual allegation."  Motion at 6:13-16.  The factual basis

15   for Williamson's legal conclusion is that he is not an employee, but is an independent contractor.

16   Complaint 1 at ¶11.  This motion cannot be resolved without determining whether Williamson is

17   an employee for purposes of ERISA.[1]

18    In his Complaint, Williamson alleges that he was an independent contractor for purposes

19   of the Plan and that LINA knew ERISA did not govern the Plan.  (Complaint ¶11, 15).  In the

20   claim file, LINA states that Williamson's claim was a "NON ERISA claim," which factually

21   supports Williamson's allegation that LINA knows ERISA does not apply.  (October 26, 2009

22   claim file note, attached as Exhibit 1.)[2]  These facts alone, if assumed true, establish that ERISA

23   does not govern the Plan, and it allows Williamson to move forward with his claims.

24

25

26   [1] LINA concedes that whether Williamson is an independent contractor is a question of fact
     beyond the scope of its Motion to Dismiss.  Motion at n.3.

27   [2] Pursuant to Fed. R. Civ. P. 56(c), Williamson acknowledges that, by attaching materials
     outside the pleadings, this Court may consider the Motion as one for Summary Judgment.  *See*

28   *Anderson v. Angelone,* 86 F.3d 932, 934 (9th Cir. 1996).

**A.**   ***Williamson's Employment Status is Relevant, because it Determines Whether ERISA Governs the Plan.***

Williamson's independent contractor status is relevant as to whether ERISA governs the Plan.  Independent contractors are not employees for purposes of ERISA.  *Barnhart v. N.Y. Life Ins. Co.,* 141 F.3d 1310, 1312 (9th Cir. 1998).  In *Barnhart,* Thomas Barnhart ("Barnhart") entered into a contract with New York Life Insurance Company ("New York Life") that authorized Barnhart to sell insurance policies on behalf of New York Life and provided the terms of commission he would receive for the sales.  *Barnhart,* 141 F.3d at 1312.  After several years of employment, Barnhart was terminated.  *Id.*  In response, Barnhart sued New York Life alleging, *inter alia,* that New York Life violated his rights under ERISA. *Id.* The trial court granted summary judgment in favor of New York Life finding that Barnhart was an independent contractor and not an employee and therefore not entitled to sue New York Life under the ERISA statute.  *Id.*   Barnhart appealed, claiming that there was an issue of fact as to whether he was an independent contractor or an employee under ERISA.  *Id.*

The Ninth Circuit followed the U.S. Supreme Court's decision in *Darden*, considering the twelve factors for determining who qualifies as an employee under ERISA:

| | |
|---|---|
| 1) | The skill required; |
| 2) | Source of the instrumentalities and tools; |
| 3) | Location of the work; |
| 4) | Duration of the relationship between the parties; |
| 5) | Whether the hiring party has the right to assign additional projects to the hired party; |
| 6) | The extent of the hired party's discretion over when and how long to work; |
| 7) | The method of payment; |
| 8) | The hired party's role in hiring and paying assistants; |
| 9) | Whether the work is part of the regular business of the hiring party; |
| 10) | Whether the hiring party is in business; |
| 11) | The provision of employee benefits; and |
| 12) | The tax treatment of the hired party. |

*Barnhart,* 141 F.3d at 1312-13 (citing *Nationwide Mutual Ins. Co. v. Darden,* 503 U.S. 318, 323-24 (1992)).  Upon balancing those twelve factors, the Ninth Circuit held that Barnhart was an independent contractor and not an employee under ERISA because:

    o  Barnhart's contract stated explicitly that he would be considered an

independent contractor, not an employee.

   o  Barnhart was free to operate his business as he saw fit without day-to-day intrusions.

   o  Barnhart was in commissions only after his first three years.

   o  Barnhart's tax returns indicate that he received most of his income from self-employment; and

   o  Barnhart sold competitor's products.

*Id.* at 1313. It was not enough that New York Life had provided Barnhart with life insurance, pension and 401k benefits, which are benefits "usually associated with employment." *Id.* In light of the *Barnhart* Court's application of the *Darden* test, it found that Barnhart "was not an employee of New York Life for purposes of ERISA" and refused "to alter the requirement that claimants under ERISA . . . must be employees." *Id.*

     An examination of the factors as they apply to Williamson leads to the same result. Williamson's employment contract explicitly defined him as an independent contractor. (Exhibit 2, Independent Contractor Agreement). First Command never paid Williamson any wages, and he worked exclusively off of commission. (Exhibit 3, Declaration of Lavon Williamson at ¶2; Exhibit 2 at ¶9(a)). All of Williamson's commissions were reported with an IRS 1099-Misc form as "non-employee compensation," and he operated as a sole proprietor for all tax purposes. Exhibit 3 at ¶ 2. First Command had no control over where Williamson operated his business; he determined the locations of his several offices within his region, rented them in his name and paid the rent. *Id.* at ¶ 3; Exhibit 2 at ¶4(a). He purchased all of his own supplies and office furniture and, when applicable, leased his own phone system. Exhibit 3 at ¶ 3; Exhibit 2 at ¶4(c). First Command provided guidelines for hours of operation, however, Williamson was free to come and go as he pleased. Exhibit 3 at ¶ 3; Exhibit 2 at ¶4(a). Williamson generated his own leads and his own customer base. Exhibit 3 at ¶ 4. Further, he employed staff that he personally paid and for whom he paid payroll taxes, and none of his employees were covered by the Long Term Disability Policy issued to First Command. *Id.* at ¶5. When considering all of the *Darden* factors, Williamson was an independent contractor and not an employee for purposes of the Plan.

Moreover, Williamson's contract specifically indicates that Williamson's status "***shall not be that of an employee or full-time life insurance salesperson under the terms of any federal, state, or local law.***"  Exhibit 3 at ¶4(b).

LINA argues that *Barnhart* is distinguishable for two reasons: 1) "*Barnhart* did not involve benefits under a disability plan or policy;" and 2) "*Barnhart* did not evaluate whether a particular plan or policy was an employee benefit plan under ERISA, or whether the plan or policy provided coverage to a mixed group of employees and independent contractors, which the plaintiff presumably asserts is the situation here."  Motion at 8:15-20, 9:1-3.  Both arguments fail.

The fact that *Barnhart* did not involve a specific benefit plan is of no consequence.  The case defined who has right to bring suit under ERISA.  *Barnhart* 141 F.3d at 1313.  Whether ERISA governs the insurance policy is the exact issue currently in dispute.

Second, if it matters that *Barnhart* did not evaluate whether a policy was an employee benefit plan, then the Court must engage in determining whether the policy is an employee benefit plan and that issue cannot be resolved on the motion to dismiss.[3]  *See* Section C, *infra*.  Williamson is an independent contractor and not an employee.  Under *Barnhart* and *Darden*, this means that ERISA does not govern the Plan.

### B.   Under Ninth Circuit Law, Williamson is not a "Beneficiary" for Purposes of ERISA.

Despite the clear precedent of *Barnhart* and *Darden,* LINA argues that Williamson's employment status does not matter, relying on Seventh Circuit case law for the proposition that Williamson is a "beneficiary" and, therefore, can bring a claim under ERISA.[4]  However, the Ninth Circuit already established that employment status *does* matter by finding that independent contractors are not employees for purposes of ERISA.  *See Barnhart* 141 F.3d at 1312.  The

---

[3] LINA's Motion assumes that Williamson is arguing that the plan is an ERISA plan as to some employees and a non-ERISA plan as to others.  Motion at 9:2-3.  Williamson does not make that claim, he has no way of knowing whether the plan is an ERISA benefit plan and neither does the Court at this stage.  *See* Section C, *infra.*

[4] ERISA applies to "employee benefit plans" that provide for one of two classes of covered persons: "participants or their beneficiaries."  29 U.S.C. §§ 1002(1), 1003(a).

1  Seventh Circuit only addressed the definition of beneficiary, determining that "beneficiary" is
2  defined as anyone who receives benefits under the terms of the Plan.  *Ruttenberg v. U.S. Life Ins.*
3  *Co.,* 413 F.3d 652, 661 (7th Cir. 2005).  *Ruttenberg* is factually distinguishable because it
4  involved an independent contractor commodities trader who worked alone.  He had no employees
5  of his own, nor an office of his own.  And presumably, he had no provision in his contract that he
6  could not be considered an employee for the purpose of any federal law.  *See* Exhibit 3 at ¶4(b).
7          On the road to the Supreme Court in *Darden*, the Fourth Circuit held that ERISA
8  "beneficiary" status is limited to persons whose plan coverage derives from a participant.
9  *Nationwide Mut. Ins. Co. v. Darden,* 796 F.2d 701, 704 n.3 (4th Cir. 1986)("A "beneficiary," for
10 the purposes of ERISA, is a person other than one whose service resulted in the accrual of the
11 benefits, but who is designated as the recipient of benefits accrued through the service of
12 another.").  In affirming the Fourth Circuit's opinion, the Supreme Court's determined that
13 Darden's suit could survive "only if" he was not an independent contractor.  *Darden*, 503 U.S. at
14 321.  While the Supreme Court did not directly address what constitutes a beneficiary, it is
15 unlikely that the Court overlooked the fact that the Fourth Circuit opinion, which was the very
16 focus of its review, had addressed the "beneficiary" issue.  *See Darden,* 796 F.2d at 704 n.3.
17         Additionally, several ERISA provisions show that "beneficiaries" are persons whose
18 benefits derive from those of "participants."  *See e.g.*, 29 U.S.C. § 1001(a)(referring to the
19 "continued well-being and security of millions of *employees and their dependents,*" reciting that
20 "*employees and their beneficiaries* have been deprived of anticipated benefits," and stating that
21 the legislation "is therefore desirable in the interests of *employees and their beneficiaries*"); 29
22 U.S.C. § 1001(b)( "It is hereby declared to be the policy of this Act to protect interstate
23 commerce, and *the interests of participants in employee benefit plans and their beneficiaries.*");
24 29 U.S.C. § 1001a(a)(3)(referring to the "continued well-being and security of millions of
25 *employees, retirees, and their dependents*"); 29 U.S.C. § 1002(1) (defining "employee welfare
26 benefit plan" as plan established or maintained "for the purpose of providing for its participants or
27 their beneficiaries").  This definition of "beneficiary" accords with the repeated statements of the
28 Supreme Court: "ERISA was enacted to promote the interests of employees and their

1    beneficiaries in employee benefit plans." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101,

2    113 (1988); *Shaw v. Delta Airlines. Inc.,* 463 U.S. 85, 90 (1982); *Nachman Corp. v. Pension*

3    *Benefit Guaranty Corp.,* 446 U.S. 359, 361-62 (1980).

4           In a footnote, LINA refers to the Ninth Circuit's decision in *Peterson v. American Life &*

5    *Health Ins. Co.,* 48 F.3d 404, 407-08 (9th Cir.), *cert. denied,* 516 U.S. 942 (1995).  Motion at 8

6    n.4.  *Peterson* does not help LINA.  Although *Peterson* concludes that an employee can be a

7    beneficiary, it does not include that a non-employee can be a beneficiary.  *See Id.* at 409.  If this

8    Court adopts the analysis in *Ruttenberg,* the distinction between "employee" and "independent

9    contractor" for purposes of ERISA will be destroyed.  *Barnhart* cannot be reconciled with

10   *Ruttenberg.*

11          **C.      LINA Cannot Establish that The Policy Constitutes an Employee Benefit**

12          **Plan.**

13          Even before one gets to the issue of participant vs. beneficiary vs. employee, the matter of

14   whether the insurance policy at issue is even an employee welfare benefit plan must be answered.

15   The existence of an ERISA plan is a question of fact, to be answered in light of all the

16   surrounding circumstances from the point of view of a reasonable person."  *Stuart v. UNUM Life*

17   *Ins. Co. of Am.,* 217 F.3d 1145, 1149 (9th Cir. 2000) (quoting *Zavora v. Paul Revere Life Ins.*

18   *Co.,* 145 F.3d 1118, 1120 (9th Cir. 1998)).  LINA bears the burden to establish that the policy is

19   an employee welfare benefit plan.  *See Kanne v. Connecticut Gen. Life Ins. Co.,* 867 F.2d 489,

20   492 n.4 (9th Cir. 1988).  It cannot meet its burden at this stage of the litigation.

21          Williamson should have the opportunity to determine whether the Plan falls under the

22   United States Department of Labor's "safe harbor" regulation ("Safe Harbor").  An insurance

23   program is not governed by ERISA if it meets the following four conditions of Safe Harbor:

24          1.   No contributions are made by an employer or employee organization;

25          2.   Participation in the program is completely voluntary for employees and
                 members;

26

27          3.   The sole function of the employer or employee organization with
                 respect to the program are, without endorsing the program, to permit the
28               insurer to publicize the program to employees and members, to collect

premiums through payroll deductions or dues check-offs, and to remit them to the insurer, and;

4. The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deduction or dues check-offs.

29 C.F.R. § 2510.3-1(j).  Based on the evidence available, the Plan meets the first two requirements of the Safe Harbor provision:  Williamson paid his own premiums without contribution from First Command (Williamson Decl. ¶ 6), and his participation in the Plan was wholly voluntary (Williamson Decl. ¶ 7).  The remaining two requirements cannot be determined at this stage, making a motion to dismiss inappropriate.  LINA's Motion should be denied, so that Williamson can adequately develop his claims through the discovery process.

> **D.     Even if ERISA Governs the Policy, Leave to Amend is the Appropriate Remedy, Not Dismissal of the Complaint.**

Even if this Court finds that ERISA governs the Plan, Williamson should be given the opportunity to amend his Complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, refashioning it as an ERISA action under 29 U.S.C. § 1132(a)(3).  Rule 15(a) provides that a party may amend "the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  In dismissing for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990).  The Ninth Circuit has made clear that, in exercising its discretion, "a court should be guided by the underlying purpose of Rule 15, which was to facilitate decisions on merits, rather than on technicalities or pleadings."  *James v. Pliler,* 269 F.3d 1124, 1126 (9th Cir. 2001) (citing *U.S. v. Webb*, 655 F.2d 977, 979-980 (9th Cir. 1981).  Williamson's Complaint has merit and should be amended before it is dismissed.

1

## II.    CONCLUSION

2

Williamson's Complaint alleges sufficient facts that, if true, entitle him to relief.  He was

3

an independent contractor for First Command, which means that ERISA does not govern the

4

Policy.  Because ERISA does not govern the Policy, Williamson's claims are not preempted by

5

ERISA.  Moreover, the threshold question of whether the insurance policy at issue even

6

constituted a welfare benefit plan cannot be resolved at this stage.  LINA's Motion should be

7

denied.

8

Dated this 23rd day of June 2010.

9

10

CHASEY HONODEL
THE COUNTERS FIRM, P.C.

11

12

13

By: /Lisa J. Counters_____

14

Amy Honodel
Nevada Bar No. 7755

15

CHASEY HONODEL
3295 N. Fort Apache Rd., Ste. 110

16

Las Vegas, NV 89129

17

and

18

19

Lisa Counters, *Pro Hac Vice*
The Counters Firm, P.C.

20

20987 N. John Wayne Parkway
Ste. B104-381

21

Maricopa, AZ  85139

22

23

24

25

26

27

28

EXHIBIT 1

EXHIBIT 1

## Contact Task - Contact - Claimant

| Name | LAVON  WILLIAMSON | SSN | 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 | DOB | 03/09/1955 |
|------|-------------------|-----|-------------|-----|------------|
| Account Name | FIRST COMMAND FINANCIAL PLANNI | Account # | FLK0960305 | Incurred Date | 02/20/2009 |
| Claim Manager | Young Chang | Incident # | 1936338 | Claim Eff Dt-Status | 06/30/2009 – Closed |

| Title | Appeals | | |
|-------|---------|---|---|
| First Name | Lavon | Last Name | |
| Role | Employee | Other | |
| Contact Method | Incoming Call | | |

☐  **First Attempt**

| Result | | Date | | User | |
|--------|---|------|---|------|---|

☐  **Second Attempt**

| Result | | Date | | User | |
|--------|---|------|---|------|---|

**Provider First Name**                                    **Provider Last Name**

**Provider Specialty**

**Call Summary**

called to find out status of appeal - ACS looked up appeal - no appeal process - claim was re-denied on 9/14/09 by ACS in appeals - NON ERISA claim - Cx is extremely frusrated - states that he sent in an appeal certified mail 10/01 & was signed for 10/04/09 - LEVELL was stamped on return receipt - he sent it to ACS attn - wants his money - knows he claim is approvable but it is of such a high dollar amount knows we do not want to pay - ACS responded w/asking Cx to refrain from lashing out at him - understands he is extremely frustrated but ACS was trying to read denial and phone doc to try and assist CX - ACS stated that do not see a record of package be recd as doc in ACCLAIM system but does not mean that has not been recd - Cx noted prior that requested a copy of claim file - it may be at copy service - ACS asked if Cx if not too much trouble could he resend info - he became vocal again - then stated he could fax the 40 pages - ACS provided him his direct fax number - advised Cx that ACS would be in contact w/Cx tomorrow concerning status of fax receipt - cx voiced understanding - 602.535.5914 HM & 702.360.4031 cell - Cx is still very vocal about adverse decisions on past appeals and how CIGNA has mishandled etc - ACS reminded Cx that he would be looking into and contact tomorrow -

| Last Changed User | Scott Hornung | **Last Changed Date** | 10/26/2009 03:40 PM |
|-------------------|---------------|----------------------|---------------------|

| **Status:** | Completed | **Assigned To:** | Scott Hornung | **Created:** | 10/26/2009 03:40 PM |
|-------------|-----------|------------------|---------------|--------------|---------------------|

Williamson_DST000025

EXHIBIT 2

EXHIBIT 2

**First Command** FINANCIAL PLANNING  # REGISTERED REPRESENTATIVE/AGENT AGREEMENT

| Lavon E. Williamson | Number 2549 | Effective June 16, 2004 |
| --- | --- | --- |

Registered Representative/Agent

## CONTENTS

1. PLACE OF AGREEMENT - LAW GOVERNING .......................... 1
2. ACTIVE MILITARY SERVICE RESTRICTION ...................... 1
3. TERRITORY ............................................... 1
4. INDEPENDENT CONTRACTOR STATUS - RIGHTS AND RESPONSIBILITIES ..... 1
5. RULES AND AGREEMENTS AS TO OBLIGATIONS, AUTHORITY, AND PROHIBITIONS 2
6. LIABILITY FOR COMPLIANCE ................................. 3
7. CONFLICTS OF INTEREST ................................... 4
8. TRADE SECRETS AND PROPRIETARY INFORMATION ................ 4
9. COMMISSIONS AND ASSIGNMENTS ............................. 4
10. PRODUCTION CREDIT ....................................... 4
11. TERMINATION OF AGREEMENT ................................ 5
12. RETURN OF PROPERTY UPON TERMINATION ..................... 5
13. COMMISSIONS AFTER TERMINATION ........................... 5
14. AGREEMENT AS TO POST-TERMINATION ACTIVITY ............... 6
15. REMEDIES ................................................ 6
16. ARBITRATION ............................................. 6

17. SOLE AGREEMENT, CONDITIONS NOT WAIVED, CONTINUING APPLICABILITY,
    AND SEVERABILITY ....................................... 7
ANNEX A - FIRST COMMAND FINANCIAL SERVICES
    AGENT COMMISSIONS AND PRODUCTION CREDIT ............ A-1
ANNEX B - FIRST COMMAND FINANCIAL PLANNING
    RR COMMISSIONS AND PRODUCTION CREDIT .............. B-1
ANNEX C - QUARTERLY PROFESSIONAL COMMISSION
    AND QUARTERLY PLAN REFUND ......................... C-1
ANNEX D - DISTRICT AGENT COMMISSION ..................... D-1
ANNEX E - DEFERRED CAREER COMMISSION PLAN .............. E-1
ANNEX F - FIELD CLIENT REPRESENTATIVE INCENTIVES ........ F-1
ANNEX G - FIRST COMMAND FINANCIAL SERVICES, INC.
    ELIGIBLE AGENTS' COMPENSATORY AND RETENTION PROGRAM G-1
ANNEX I - FUTURE INCENTIVE COMMISSIONS ................. I-1
ANNEX N - SPECIAL COMMISSION AVAILABLE TO NEW RR/AGENTS ...... N-1

Lavon E. Williamson

This Agreement is made between ("RR/Agent"), First Command Financial Planning, Inc. ("FCFP"), and First Command Financial Services, Inc. ("FCFS"), a Nevada corporation, jointly referred to in this Agreement and its Annexes as "First Command." As detailed on the following pages, this is an agreement under which RR/Agent will represent First Command in offering products to the public which First Command is authorized to sell and for which RR/Agent will be paid sales commissions. RR/Agent will represent First Command as an independent contractor and not as an employee, and will be financially responsible for RR/Agent's own taxes, social security, benefit plans, business expenses, licensing and registration expenses, and liability insurance. RR/Agent acknowledges that RR/Agent must observe the policies and procedures of any business organization that RR/Agent represents and agrees to do so in representing First Command and the insurance companies and securities distributors whose products are sold. RR/Agent additionally recognizes that the insurance and securities industries are highly regulated, and RR/Agent agrees to be responsible for knowledge of and compliance with the laws, regulations, and rules governing these businesses as they affect RR/Agent.

Accordingly, FCFP hereby appoints RR/Agent to represent it as its Registered Representative in soliciting and selling securities for which it may act as dealer, underwriter, or broker, and FCFS hereby appoints RR/Agent to represent it as its Agent in soliciting and selling insurance, and RR/Agent hereby accepts these appointments subject to the terms and conditions stated above and following.

## 1. PLACE OF AGREEMENT - LAW GOVERNING

This Agreement is made in Fort Worth, Tarrant County, Texas (or if not actually made in Fort Worth, Tarrant County, Texas, is not binding until accepted and approved at the Home Office of First Command in Fort Worth, Tarrant County, Texas). Any and all sums of money due or becoming due to RR/Agents under this Agreement shall be payable at First Command's Home Office in Fort Worth, Tarrant County, Texas. Any claim for such money shall be made to First Command's Home Office and, subject to paragraph "16." below, any lawsuit filed to collect such money or any other dispute arising out of this Agreement shall be governed by the laws of the State of Texas and the United States. The district courts of Tarrant County, Texas shall have jurisdiction over any such claim or dispute. Jurisdiction and venue for any proceeding, including arbitration arising from or out of this Agreement, shall be in Tarrant County, Texas.

## 2. ACTIVE MILITARY SERVICE RESTRICTION

RR/Agents on any form of active duty (including terminal leave) in any military service will not solicit sales for, recommend, or sell any insurance or investment product to any person or other entity or otherwise communicate with any First Command client or prospective client in any manner which states or implies RR/Agent's affiliation with First Command in any capacity other than as a client.

## 3. TERRITORY

RR/Agent agrees to represent First Command and solicit sales in the geographical area assigned by the Regional Agent to whom designated. If designated to a territory within the United States, RR/Agent will become and remain licensed for life insurance sales and registered for securities sales in the jurisdiction in which sales are solicited, and registered with the National Association of Securities Dealers ("NASD"). If designated to a territory outside the United States, the RR/Agent will become and remain registered with the NASD and become and remain licensed for life insurance sales in at least one state.

## 4. INDEPENDENT CONTRACTOR STATUS - RIGHTS AND RESPONSIBILITIES

a. Within the territory in which RR/Agent agrees to represent First Command, RR/Agent shall use his or her own judgment as to the time, place, and means of exercising authority under the terms of this Agreement. RR/Agent is not required to personally provide the services described herein but may delegate the performance of such services to RR/Agent's employees or others, provided RR/Agent is not personally required to perform such services by insurers, securities distributors, or applicable laws, regulations, and rules, and further provided that RR/Agent remains fully responsible for all obligations agreed to herein.

1

02/22/2038  18:57  6623356914          VON WILLIAMSON              PAGE  03/08

b. It is specifically understood and agreed that RR/Agent's appointment under this Agreement constitutes RR/Agent as an independent contractor, and that the status of RR/Agent hereunder shall not be that of an employee or full-time life insurance salesperson under the terms of any federal, state, or local law. Neither FCFP nor FCFS will withhold any deductions for social security, income taxes, unemployment, workers' compensation, or other taxes imposed upon an employer/employee relationship. Thus, RR/Agent shall be responsible for all self-employment taxes and all other related governmental obligations, including all local fees and taxes incidental to doing business as a Registered Representative and insurance Agent.

c. RR/Agent agrees to pay all business expenses incurred in representing First Command. Such expenses include those incurred in the operation of RR/Agent's office, and for all First Command sales materials used by RR/Agent. It is specifically understood and agreed that any person hired, engaged, or employed by RR/Agent shall not be considered an employee of First Command. All expenses and liabilities of any kind incurred by RR/Agent in the employment of any person shall be considered a business expense in the operation of RR/Agent's office.

d. RR/Agent further agrees to pay First Command for each Family Financial Plan ("Plan") prepared and audited on his or her behalf, for the purpose of defraying the costs associated with Plan production. RR/Agent can qualify for a Quarterly Plan Refund ("QPR") which is dependent upon the number and type of Plans produced in a quarter. Plan charges and the QPR are discussed in Annex C of this Agreement.

e. If expenses or other amounts owed to First Command or its subsidiaries by RR/Agent exceed monthly commissions, a loan may be extended to cover such expenses. The loan will accrue interest at a rate to be determined by FCFS, and be secured by any and all amounts which become payable to RR/Agent by First Command.

f. RR/Agent agrees to maintain electronic mail ("e-mail") connectivity between RR/Agent's office and the Home Office of First Command by means of the companies' prescribed e-mail software program, to use only the Home Office prescribed e-mail system for all electronic communication of First Command-related business, and to transmit no personal, non-business related communications on the First Command e-mail system. RR/Agent further agrees to respond to e-mail correspondence and to comply with NASD and United States Securities and Exchange Commission ("SEC") rules and regulations concerning E-mail communications, in accordance with current directives.

## 5. RULES AND AGREEMENTS AS TO OBLIGATIONS, AUTHORITY, AND PROHIBITIONS

a. RR/Agent acknowledges that he or she is subject to and agrees to abide by the policies and procedures of First Command published in Written Supervisory Procedures and Statements of Policy ("SOP"), the rules and regulations of the SEC, the NASD, Municipal Securities Rulemaking Board, Securities Investor Protection Corporation, applicable state insurance and securities laws and regulations, the rules and regulations of the insurance companies represented, applicable Department of Defense and subordinate Army, Navy, Air Force, and Marine Corps directives, Coast Guard directives, and any other regulatory agencies as to insurance or securities sold by RR/Agent.

b. RR/Agent agrees to:

(1) Treat all monies received from clients on behalf of First Command as trust funds and to forward all such monies promptly upon receipt to FCFP or appropriate investment companies on behalf of FCFP, or to appropriate insurance companies on behalf of FCFS.

(2) Place through First Command all business in which the client's or prospect's interest was generated by advertising, seminars, Plans, proposals, and/or sales presentations prepared by First Command or its RR/Agents, or by referrals from other First Command clients, prospects, or RR/Agents, giving First Command and companies represented by them first opportunity for acceptance or refusal of all investment or insurance business generated from prospects, clients, and/or members of their immediate families.

(3) Make timely and proper delivery to the policyowner of all insurance policies, and notify the First Command Director, Financial Planning if such delivery cannot be accomplished within 30 days after receipt by RR/Agent of the policy to be delivered.

c. RR/Agent acknowledges that:

(1) RR/Agent shall have no authority to make, alter, or discharge an investment contract, to waive forfeitures, or to incur any liability on behalf of FCFP or any securities distributor represented by FCFP.

(2) RR/Agent shall have no authority on behalf of FCFS or any insurance company represented by FCFS to make, alter, or discharge any policy or annuity contract, to extend the time for applying a premium or consideration, to waive forfeitures, nor allow the delivery of any policy unless the proposed insured is in good health and the first premium is paid in full or an appropriate military allotment has been duly filed.

(3) RR/Agent shall have no authority to commit First Command Bank ("FCB") to establish any account, approve any loan, pay a pre-determined rate of interest, or provide any services.

(4) RR/Agent shall not have any right to bind First Command in any way or make any contract, promise, or representation on behalf of First Command except as set forth in this Agreement. RR/Agent is particularly not authorized to enter into any lease for any type of property, establish any bank account, or contract in any way, in the name of "First Command," "First Command Financial Planning, Inc.," "First Command Financial Services, Inc.," "FCFP," "FCFS," or any derivative thereof.

(5) Client information is confidential and will only be used by a client's servicing RR/Agent and his or her employees for sales and client service. Such information must be protected at all times as prescribed in SOP 8-5, titled "Release of Client Information," and SOP 8-7,

titled "Privacy Policy." Accessing and/or using client information by any other party for any other purpose shall be considered a breach of this Agreement by an RR/Agent allowing such access or doing such accessing.

d. RR/Agent further agrees that:

(1) RR/Agent shall not serve as Trustee of any Trust except for one in which RR/Agent or a member of his or her immediate family is the Grantor, Trustor, or Testator. For this purpose, "immediate family" is defined as legal spouse, natural or adopted child, sibling, or natural or adoptive parent of RR/Agent.

(2) RR/Agent shall not serve as the Executor, Executrix, Administrator, or Administratrix of any estate except that of a member of his or her immediate family. For this purpose, "immediate family" is defined as legal spouse, natural or adopted child, sibling, or natural or adoptive parent of RR/Agent.

(3) RR/Agent shall not be a party to any contractual agreement to sell any insurance or investment product or to represent any insurance company or securities distributor other than those with whom First Command maintains a written sales agreement.

(4) Exceptions to the provisions of this paragraph "5.d." may be requested in writing to the Presidents of First Command Financial Planning, Inc. and/or First Command Financial Services, Inc.

e. The term "Certified Financial Planner" and the letters "CFP" are protected by federal law and may only be used by RR/Agents who are licensed by the Certified Financial Planner Board of Standards, Inc. These and other specialized financial planning designations shall not be used unless RR/Agent is formally certified for those designations, and agrees to and abides by all terms and conditions upon which the certifications are awarded.

## 6. LIABILITY FOR COMPLIANCE

RR/Agent further agrees:

a. To hold First Command harmless and indemnify it fully from any and all losses, expenses, damages, costs, and attorney fees that First Command may incur by reason of RR/Agent's conduct of his or her business or otherwise, as a result of any unauthorized act, omission, misrepresentation, or misinformation by RR/Agent, be it intentional or resulting from RR/Agent's negligence, by failure to reveal fully and accurately on an investment application any information which is known to RR/Agent and required by the securities distributor, or by failure to reveal fully and accurately on an insurance application any pertinent information bearing on the health, hazardous duty, profession, or practices of the applicant which is known to RR/Agent and required by the insurance company.

b. That First Command shall have the right to deduct any such losses, expenses, damages, or costs (including the cost of investigating or defending against a claim), and to offset any such damages, expenses, or attorney fees from any and all commissions or other monies otherwise payable to RR/Agent under the terms of this Agreement, and RR/Agent further agrees to reimburse First Command for any such

losses in excess of commissions due. Additionally, in the event either FCFP or FCFS shall determine, in their sole discretion, that RR/Agent has committed any of the acts described in subparagraph "6.a." above, FCFP or FCFS, as applicable, shall have the right to charge back any amounts previously earned on, or as a result of, the sale in question, regardless of whether any loss has been experienced by FCFP, FCFS, or the providers of the product sold.

c. To fully and accurately complete and sign Form 803-E, titled "Compliance Checklist Disclosures," which is designed to communicate and confirm First Command policies and procedures as well as general regulatory compliance, which First Command may from time to time provide. RR/Agent's failure to do so shall be considered a breach of this Agreement.

d. In the event RR/Agent observes or otherwise has knowledge of the violation by any other First Command RR/Agent of any law, regulation, rule, First Command policy or procedure pertaining to the conduct of the investment or insurance businesses, or of the terms of this Agreement, he or she must report such violation expeditiously to the Presidents of First Command Financial Planning, Inc., and/or First Command Financial Services, Inc., through RR/Agent's DA and Regional Agent ("RA"), and acknowledges that failure to do so may be considered a breach of this Agreement.

e. That, for the purpose of assuring that any RR/Agent's actions are in compliance with securities and insurance laws, regulations, and rules, DAs, RAs, and Home Office personnel are authorized and expected to periodically visit and observe operations, offices, records, and activities of RR/Agents, and to observe RR/Agent appointments with prospects and clients to verify that only Home Office approved sales presentations and techniques are used.

f. To pay for, assume responsibility for, and indemnify and hold First Command harmless from and against any and all claims, demands, liability, causes of action, suits, judgments, or defense expenses (including attorney's fees, expert witness fees and costs) for all damage to property or personal injury to any person (including but not limited to, RR/Agents, employees, and invitees of RR/Agent), including the loss or loss of use thereof, directly or indirectly connected with, attributable to or arising from the services to be performed under this Agreement, unless the injury, death, damage, or loss is caused solely by the unauthorized, negligent, or unlawful acts of First Command. This provision is intended to indemnify First Command against the consequences of its partial, joint, or concurrent negligence (active or passive) or fault, and to offset any such damages, expenses, or attorney fees from any and all commissions or other monies otherwise due from First Command to RR/Agent.

g. To carry, in full force at all times, bodily injury and property damage insurance on any motor vehicle owned or leased by RR/Agent to indemnify against loss of this nature, in limits of not less than $100,000 for damage to property of other persons in any one accident, and not less than $300,000 for the death of or injury to one person in any one accident, and not less than $500,000 for more than one person in any one accident. RR/Agent further agrees to carry higher limits if required by his or her state of legal residence or state in

which licensed to do business on behalf of First Command. First Command Financial Services, Inc., will be named as an additional insured on all such policies.

## 7. CONFLICTS OF INTEREST

a. RR/Agent acknowledges that all information concerning the identity and productivity of RR/Agents or employees of First Command is confidential and proprietary to First Command and to those RR/Agents or employees. RR/Agent acknowledges that he or she will not, directly or indirectly, use, disclose, or make available in any manner, to persons other than duly authorized First Command RR/Agents or employees, such confidential and proprietary information.

b. RR/Agent further agrees that RR/Agent will not during the term of this Agreement and for two years after its termination:

   (1) Solicit or induce any RR/Agent, employee of any RR/Agent, or employee of First Command to terminate their First Command RR/Agent Agreement or employment.

   (2) Enter into or invest in any business directly or indirectly competing with First Command with any RR/Agent or employee of FCFP, or with any former RR/Agent, RR/Agent employee, or employee of First Command who has performed any services for First Command within any of the 12 preceding months.

## 8. TRADE SECRETS AND PROPRIETARY INFORMATION

a. **Sales Material.** First Command may make sales materials available to RR/Agent, including limited access Web sites and computer software created and/or compiled by them. It is further agreed and understood that all such items created and/or compiled by First Command, whether or not copyrighted, are confidential and proprietary to First Command. RR/Agent shall safeguard all such materials, including, but not limited to, forms, books, tapes, manuals, rosters, online tools (e.g., ▓▓▓▓, CommandNet, CommandPost), and software in a confidential manner, and shall not disclose or make available to persons other than duly authorized First Command RR/Agents or their employees, such confidential or proprietary information of First Command and its clients.

b. **Insurance and Client Information.** RR/Agent acknowledges that as an RR/Agent, he or she will become acquainted with confidential and proprietary information of First Command relating to persons, firms, and organizations which are clients of First Command. This confidential information may include, but is not necessarily limited to, the names and addresses of clients and prospective clients, computer software, compilations of census data, information concerning the policies and procedures of the United States military services, policy expiration dates, policy terms, conditions and rates, and client risk characteristics. RR/Agent agrees to safeguard all such materials in a confidential manner and will not, without the prior written approval of the Presidents of First Command Financial Planning, Inc., and/or First Command Financial Services, Inc., directly or indirectly use, disclose, or make available in any manner to persons other than duly authorized First Command RR/Agents or employees, such confidential or proprietary information of First Command and their clients.

c. **Product and Marketing Information.** It is agreed that First Command has a proprietary interest in all information concerning their products, processes, and services, including information relating to research, development, programming, computer software, accounting, marketing and pricing techniques, briefings, charts, films, slides, presentations, merchandising, and clients, which information is not generally known in the industries in which First Command are engaged, and which may become known by, or disclosed to, RR/Agent solely as a consequence of RR/Agent's dealings with First Command. RR/Agent agrees not to use, disclose, or make available in any manner to persons other than duly authorized First Command RR/Agents or employees, such confidential or proprietary information of First Command and their clients.

## 9. COMMISSIONS AND ASSIGNMENTS

a. **RR/Agent Commissions.** RR/Agent's sole sources of remuneration under this Agreement are the sales commissions and, as to certain investments, service fee commissions scheduled in the attached Annexes or on CommandPost, which are incorporated into this Agreement for all purposes. *First Command reserves the right to change the portion of this Agreement pertaining to RR/Agent sales commissions and service fee commissions, as well as any of these Annexes, provided that written notice of all changes is posted to RR/Agent prior to the effective date of the changes.* No other compensation – such as payment for franchise rights, ownership interest, goodwill, or other remuneration or consideration – shall be due from FCFP and/or FCFS to RR/Agent, DA, RA, notwithstanding the fact that RR/Agent has established an office, has maintained administrative facilities, has relocated, or for any other reasons during the term of this Agreement or thereafter.

b. **Commission Assignments.** RR/Agent agrees that:

   (1) All monies payable to him/her from the insurance companies or securities distributors represented by FCFP or FCFS are hereby assigned to FCFP or FCFS, respectively, for payment in accordance with the Annexes attached hereto and the other terms and provisions contained herein.

   (2) Commissions payable under this Agreement or any other contract between RR/Agent and FCFS or its subsidiaries may be retained at any time and applied to amounts owed to FCFS or its subsidiaries. Such amounts include, but are not limited to, amounts owed by RR/Agent pursuant to paragraph "6." above, commission chargebacks related to nonpersistent sales, the payment for supplies, license fees or other expenditures incurred on behalf of RR/Agent on the part of FCFS or its subsidiaries, and recoupments of incentive payments and delinquent debt owed FCB.

   (3) No assignment to third parties of commissions earned, accrued, or to accrue under this Agreement shall be binding upon FCFP or FCFS or the insurance companies and securities distributors represented by First Command.

## 10. PRODUCTION CREDIT

Production Credit ("PC") is defined as the credit awarded within the RR/Agent Recognition System for selected sales by

RR/Agent. The amount of PC awarded is based on the category of client to which the sale was made and the product sold. PC is a component of the RR/Agent recognition program as described in SOP 13-9, titled "Agent and Senior Agent Recognition, Production Credit, and Special Incentives." PC on investment or insurance sales will be awarded by FCFP or FCFS upon the receipt of acceptably documented details of a sale. PC for Select Investor Plan ("SIP") accounts and FCB Trust accounts will be awarded when commissions are paid on those accounts to RR/Agent. *Credit will be awarded for the production month in which the required sales documentation, SIP account commission, or FCB Trust account commission is received at the First Command Home Office. The production month is from the 16th of one month to the 15th of the next month and is identified by the month in which it ends; e.g., the June production month ends on June 15th. The envelope transmitting the sales documentation must arrive on or before the close of business on the 15th of the month or, if the 15th occurs on a weekend or holiday, the first business day thereafter to be counted for that production month. Under no circumstances will PC be awarded retroactively.* Additional information concerning the award of PC for insurance and investment sales, SIP accounts, and FCB Trust accounts is provided in Annexes A and B of this Agreement. However:

a. Whenever an investment amount or insurance premium is to be paid by military allotment, PC will be awarded only after an authentic copy of the properly registered military allotment (or a suitable substitute) is received by First Command at its Home Office.

b. The submission of any insurance or investment application, or the causing of any existing insurance policy or investment plan to be continued in force, under any circumstances when it is known by RR/Agent that the client does not genuinely intend to retain the account or policy for any reason, and specifically when such action by RR/Agent results in, or is for the purpose of, attaining or maintaining production or persistency minimums for earning certain incentive commissions, or for any other purpose of monetary gain, constitutes a breach of this Agreement.

c. **Controlled Business.** Insurance policies or investment products sold by an RR/Agent for RR/Agent's own account, or to an RR/Agent's spouse, parents, children, employees, or to another First Command RR/Agent, or to the spouse, parents, children, or employees of said RR/Agent, shall be identified as "controlled business" on the Cover Memo provided to First Command by RR/Agent and shall be subject to the following special rules:

(1) If any such controlled business becomes nonpersistent (as described in Annexes A and B of this Agreement), the PC penalty normally applicable to such nonpersistent business shall be double that described in the respective Annexes.

(2) In addition, First Command may retroactively apply the PC penalty to the date of the original sale and adjust accordingly any commissions which may have been paid or recognition granted as a result of the originally awarded PC.

(3) If any insurance sale defined as controlled business directly or indirectly replaces existing insurance sold through FCFS, no commissions shall be paid or PC awarded as a result of the issuance of the controlled business. For purposes of this provision, an indirect replacement will be deemed to have occurred if insurance sold through FCFS was terminated by the purchaser within six months prior to the issuance of the controlled business.

## 11. TERMINATION OF AGREEMENT

a. This Agreement can be terminated by either RR/Agent or First Command at any time without cause upon the giving of 30 days written notice to the other parties. This Agreement may be terminated immediately for cause by either First Command or RR/Agent upon the giving of written notice. Such notice may, in either case, be delivered personally or mailed to the last known address of the recipient of such notice, via United States mail or its equivalent. This Agreement shall automatically terminate upon death of RR/Agent.

b. RR/Agent specifically agrees that the provisions of paragraphs "1," "6," "7," "8," "9," "11.b.," "12," "13," "14," "15," "16," and "17" shall survive termination of this Agreement.

## 12. RETURN OF PROPERTY UPON TERMINATION

RR/Agent agrees that, within three days of the termination of this Agreement, RR/Agent shall return all First Command property to First Command, including all copies of information in RR/Agent's possession or subject to RR/Agent's control pertaining to the business, clients, and prospects of First Command, whether prepared by RR/Agent or others. RR/Agent specifically agrees that computer software belonging to First Command in his or her possession at termination shall either be turned over in its entirety to First Command's designated representative (usually RR/Agent's DA) or permanently destroyed. Until it has been established to the satisfaction of First Command that all of the foregoing has occurred, any commissions or other monies otherwise payable to the terminating RR/Agent may be withheld by First Command.

## 13. COMMISSIONS AFTER TERMINATION

a. **Termination at Any Time.** Upon termination of this Agreement, commissions due and to become due shall be retained by First Command as follows:

(1) First Command shall determine and retain amounts necessary to cover possible refunds of commissions previously paid on insurance policies and on systematic investment plans sold which may subsequently lapse or be liquidated. These amounts may be retained for a period of 25 months following the issue date of the last insurance policy sold, or 30 days following the expiration of the 18-month liquidation period allowed by the last systematic investment plan sold, whichever shall occur last.

(2) Amounts necessary for the repayment of any loans (including interest accruing on such loans until paid in full) made by FCFS and/or its affiliates to RR/Agent.

b. **Retention of Commissions By First Command.** Commissions retained by First Command may be used to cover refunds and/or repayments due to FCFP, FCFS, its subsidiaries and/or affiliates. Such retained commissions may also be used to indemnify and hold harmless First Command from any and all damages to property and/or injury to persons arising from the services to be performed under this Agreement, to cover RR/Agent's personal and shared business expenses remaining unpaid upon termination (including those incurred in the operation of RR/Agent's office, for orders for business products placed with First Command and its authorized vendors), expenses incurred by First Command on RR/Agent's behalf, and amounts owed to First Command by RR/Agent under paragraph "6." above.

c. **Payment of Remaining Commissions.** After all repayments have been made and at the end of the above-defined periods, all remaining accrued commissions, if any, will be paid to RR/Agent, together with interest at a rate equal to the 30-day Certificate of Deposit ("CD") rate at First Command Bank, Fort Worth, Texas, on the amount remaining, computed from the date said remaining amounts were received by FCFP and/or FCFS until payment. All such payments to an RR/Agent are contingent upon compliance with and in consideration of post-termination activities described in paragraphs "12." above and "14." below. In the event termination has resulted from the death of RR/Agent, such commissions shall be paid to the designated beneficiary; if no beneficiary exists, then to RR/Agent's estate. A terminated RR/Agent, RR/Agent's beneficiary, or the estate of a deceased RR/Agent is qualified to receive commissions payable on systematic investment plans and insurance policies after satisfaction of the above-described claims. However, *no commissions or fees are payable on payments made into voluntary investment accounts after termination of this Agreement.*

## 14. AGREEMENT AS TO POST-TERMINATION ACTIVITY

In addition to paragraphs "1," "6," "7," "8," "9," "11.b.," "12," "13," "14," "15," and "16" of this Agreement as they affect RR/Agent's post-termination activity, RR/Agent specifically agrees that for a period of two years following termination of this Agreement, RR/Agent will not, within 100 miles of any territory as defined in paragraph "3." above, in which RR/Agent has represented First Command:

a. Solicit, directly or indirectly, or assist or train others in the solicitation of active duty members of the United States military services or their immediate families in connection with the purchase or sale of life insurance of a type which is sold by or competes with FCFS, or investments of a type which is brokered or sold by or competes with FCFP, unless RR/Agent has obtained the prior written consent of the Presidents of First Command Financial Planning, Inc., and/or First Command Financial Services, Inc.

b. Induce, solicit, or assist others in the inducement or solicitation of any client of First Command to liquidate, partially liquidate, or transfer FCFP investment accounts to any other broker/dealer, or to cancel or replace insurance policies sold by or through FCFS, unless RR/Agent has obtained the prior written consent of the Presidents of First

Command Financial Planning, Inc., and/or First Command Financial Services, Inc.

## 15. REMEDIES

If, as a result of any activity constituting a violation of any provision of this Agreement, any commission or fee becomes payable to RR/Agent or to any other person, firm, or organization with whom RR/Agent is then associated, contracted, or employed, RR/Agent agrees that First Command will have been damaged in the amount of this commission or fee and agrees to pay, promptly to First Command an amount equal to such damages plus interest at the legal rate. Such restitution shall not, however, limit the amount of any monetary damage or the availability of any equitable remedies, including injunctive relief, to which First Command may become entitled, and First Command may withhold payment of any and all commissions otherwise due to RR/Agent during the period required to determine whether First Command is entitled to the restitution described above. In the event this determination is in favor of RR/Agent, these withholdings shall be paid to RR/Agent, with interest at a rate equal to the 30-day CD rate at First Command Bank, Fort Worth, Texas.

## 16. ARBITRATION

a. All controversies, disputes, or claims between RR/Agent and First Command arising out of and/or relating to this Agreement shall be submitted for binding arbitration to the NASD, and such arbitration proceedings shall be heard in accordance with the then current NASD Code of Arbitration Procedure; provided, however, that if such controversy, dispute, or claim is not eligible for submission to arbitration before the NASD, such matters shall be submitted for binding arbitration to the American Arbitration Association ("AAA") and such proceedings shall be heard in accordance with the then current commercial arbitration rules of the AAA.

b. Except as limited by this Agreement, the arbitrator shall have the right to award or include in the arbitrator's award any relief which the arbitrator deems proper in the circumstances including, without limitation, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief, and attorneys' fees and costs provided that the arbitrator will not have the right to award exemplary or punitive damages. The award and decision of the arbitrator will be conclusive and binding upon all parties hereto and any arbitration award may be entered as a judgment in any court of competent jurisdiction.

c. The parties hereto agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. The parties further agree that, in connection with any such arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim which is not submitted or filed as described above will be forever barred.

a. The parties hereto agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between RR/Agent and First Command may not be consolidated with any other arbitration proceeding between First Command and any other person. The costs of arbitration shall be borne equally by the parties pending a final award by the arbitrator.

b. Notwithstanding anything to the contrary contained in this paragraph "16.," RR/Agent and First Command each have the right in a proper case to obtain temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction, provided, however, that the parties agree to contemporaneously (or as soon thereafter as is reasonably possible) submit the dispute for arbitration on the merits as provided herein.

1. **SOLE AGREEMENT, CONDITIONS NOT WAIVED, CONTINUING APPLICABILITY, AND SEVERABILITY**

a. **Sole Agreement.** This Agreement supersedes all prior Agreements between RR/Agent and FCFP or FCFS and, with its Annexes, contains all of the terms and understanding between the parties hereto as of this date. The parties agree that said terms and provisions shall not be altered or modified in any manner except by mutual written agreement between

RR/Agent and the Presidents of First Command Financial Planning, Inc., and/or First Command Financial Services, Inc., provided, however, that First Command reserves the unilateral right to change the portions of this Agreement pertaining to commissions and the Annexes attached upon prior written notice, as described in paragraph "9.a." above.

b. **Conditions Not Waived.** The failure by First Command to exact strict compliance with the terms of this Agreement or to declare any default when such shall become known to First Command shall neither operate as a waiver of such terms nor release RR/Agent from RR/Agent's obligation to perform this Agreement in accordance with its terms.

c. **Continuing Applicability.** This Agreement shall be binding upon the parties, their legal representatives, successors, and assignees. It is expressly agreed that the provisions contained herein which affect RR/Agent's activities, both before and after termination, shall continue in full force and effect after this Agreement is otherwise terminated.

d. **Severability.** If for any reason any provision or portion of any provision of this Agreement is held by proper judicial authority to be invalid and/or unenforceable, said holding shall not invalidate any other portion of this Agreement which is otherwise valid and enforceable.

IN WITNESS WHEREOF, the parties to this Agreement have executed it as of the date first written above.

By _____
Signature of Registered Representative/Agent

First Command Financial Planning, Inc.

By _____
Signature of President

and

First Command Financial Services, Inc.

By _____
Signature of Vice President

EXHIBIT 3

EXHIBIT 3

### Declaration of Lavon Williamson

1. I am the plaintiff in the matter *Williamson* v. *Life Ins. Co. of N. Am.*, Cause No. 2:10-cv-00499-KJD-RJJ. I make this declaration based on my personal knowledge.

2. I was an independent contractor for First Command Financial. I was paid commissions only. My income was reported to the IRS on a 1099-Misc form as "non-employee" compensation. I operated as a sole proprietor and reported by taxes on Schedule C of my personal returns.

3. As an independent contractor, I maintained two offices in Arizona from December 2006-2009 and three offices in Nevada from 2001-2009. Although First Command had guidelines for general office operations, First Command did not decide where I officed. I determined the locations of these offices, rented the offices in my name and paid all the rent on these offices. First Command had no control over where I conducted my business. I purchased my own office furniture. I was responsible for purchasing all of my own office supplies. In some of my offices I leased the phone system. In other of my offices, I had no phone system because it was an executive suite setup. First Command did not determine when or how long I worked.

4. I received no leads for customers directly from First Command Financial. Generating business, commissions, and customers was up to me.

5. I employed staff that I personally paid and for whom I paid payroll taxes. Specifically, I employed an office manager and a client contact specialist. None of my employees were covered by the disability policy issued to First Command under which I am claiming disability benefits.

6.  I paid my own premiums for the disability coverage.

7.  The disability coverage offered by First Command was voluntary.  I could take or leave the coverage as I wanted.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:      June 22, 2010

Lavon Williamson